1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

DUANE H. GARVAIS,                          )
                                           )
                    Plaintiff,             )   No.  CV-03-0290-JLQ
                                           )
                                           )   MEMORANDUM OPINION,
                                           )   FINDINGS OF FACT, AND
         vs.                               )   CONCLUSIONS OF LAW
                                           )
THE UNITED STATES OF AMERICA,              )
                                           )
                    Defendant.             )
_____        )

     This matter came regularly on for trial by the court without a jury on the 28th day

of September, 2009.  The Plaintiff, Duane Garvais, appeared in person and with his

attorneys Paul Burns and Dana Griffin Burns.  The Defendant, the United States of

America, appeared by Robert Brouillard, Assistant United States Attorney for the

Western District of Washington, appearing specially in this matter since the United States

Attorney's office for the Eastern District of Washington recused themselves.  With Mr.

Brouillard was Jennifer Kelley, an attorney with the United States Department of Interior,

apparently appearing since the alleged wrongful actions against Mr. Garvais forming the

basis of his Federal Tort Claims Act, 28 U .S.C. § 2674, malicious prosecution claim

were by the United States Bureau of Indian Affairs and its agents.  Following completion

of the testimony on September 30, 2009, supplemental briefs were filed.  That briefing

was concluded on October 28, 2009 and the matter was then submitted for the court's

decision.

ORDER - 1

## I. **FINDINGS OF FACT**[1]

On October 27, 1999, Duane Garvais was hired by the United States Department of Interior, Bureau of Indian Affairs (hereafter BIA) as a criminal investigator, and assigned to the Spokane Indian Reservation. At that time, the BIA was the exclusive law enforcement on the Spokane Indian Reservation.

Garvais was born in 1966. Garvais had served honorably in the United States Marine Corps and prior to his employment by the BIA, had been employed as a tribal policeman on the Colville Indian Reservation. Garvais had ancestors who were Native Americans (Indians) although, Garvais was not an "Indian" subject to the jurisdiction of tribal courts as defined by the law of the United States. *See* Ct. Rec. 88 [Memorandum Opinion and Order Granting Amended Petition for Writ of Habeas Corpus]. At the conclusion of his first year of service as a BIA investigator on the Spokane Reservation, on November 13, 2000, the BIA District Commander, Ed Naranjo, signed a Memorandum stating that Garvais had performed his duties "exceptionally well" and the Deputy District Commander Glen Melville rated Garvais as "excellent" in all rating categories. (Ex. 3).

It appears that prior to the investigation by Garvais of certain BIA patrol officers with memberships in or connections to the Spokane Tribe, the Spokane Tribal Business Council, the governing body of the Spokane Indian Tribe, was well satisfied with the law enforcement and investigative work performed by Agent Garvais on the Spokane Reservation. In May 2001, Chairman Alfred Peone of the Spokane Tribe requested the assistance of Agent Garvais in the investigation of drug offenses on the Spokane

---

[1] The court's "Discussion" portion of this Memorandum opinion contains numerous mixed findings of fact and conclusions law, in addition to those findings expressly set out under this heading. Those findings shall be deemed to be part of the court's Findings of Fact and Conclusions of Law.

ORDER - 2

Reservation. (Ex. 4).  A small amount of funding was provided Garvais by the Tribe. Garvais successfully investigated and made controlled buys of illegal drugs on the Spokane Reservation as requested by the Tribal Council.  Those buys resulted in successful criminal prosecutions.

In the year 2001, Agent Garvais became aware of thefts by BIA patrolmen on the Spokane Reservation of stereo and radio equipment from impounded automobiles and also from one tribally owned automobile.  These thefts were allegedly performed by several Spokane Reservation and BIA patrol officers. The offending officers were a member of the Spokane Tribe and a descendant of the Spokane Tribe closely connected to members of the governing Spokane Tribal Council.  Garvais advised his supervisors, District Commander Ed Naranjo and Deputy District Commander Glen Melville, of BIA District V in Billings, Montana, of his findings.  Commander Naranjo sent Deputy Commander Melville to Spokane to assist Garvais in this investigation. Melville and Garvais interviewed the accused BIA patrolmen who admitted the thefts.  The unequivocal testimony of Deputy Commander Melville concerning the theft admissions was not challenged by the Defendant United States.  These officers were then placed on administrative leave, but when Melville proposed to terminate their BIA employment, Naranjo rejected that action. The testimony herein of Deputy Commander Melville confirmed the foregoing.  Melville testified that there was no wrongdoing by Garvais in this investigation and the Defendant did not contend to the contrary.  The thefts were referred to the United States Attorney's office in Spokane.  Apparently, at some later date, that office declined prosecution in federal court.

The Spokane Tribal Council became aware of the allegations of thefts from the automobiles by the BIA patrolmen, but did not discuss the matter with Agent Garvais or Deputy Commander Melville.  Instead, the Tribal Council ordered Commander Naranjo to appear before it.  In an obvious and blatant effort to protect the two offending patrolmen, at its meeting with Commander Naranjo on November 21, 2001, the Tribal

ORDER - 3

Council demanded that Agent Garvais "be permanently removed from the assignment at the Spokane Agency," stating and passing a formal resolution calling the theft activities by the patrolmen a "prank". The written resolution (Exs. 5 & 514)(hereinafter "the Resolution") for the first time stated that the Tribal Council was not satisfied with the work of Agent Garvais, particularly in his investigation of drug offenses, as previously requested by the Tribal Council. The Resolution included a request that the head of the BIA Office of Law Enforcement Services "conduct a full investigation of the ethical and legal implications of the manner in which this **prank investigation** was performed and supervised by the Billings Office of Law Enforcement Services . . . . and his use of Tribal funds for undercover drug buys . . ." (Ex. 5)(emphasis added). Immediately prior to the November 21, 2001 meeting, the Tribal Council directed its then Tribal lawyer to forthwith and immediately review the accounting of drug buy monies furnished Garvais. No evidence then existed that Garvais had failed to properly account for or obtain receipts for payment of drug buy monies.

On November 30, 2001, Alfred Peone, the Chairman of the Spokane Tribal Council forwarded a letter (Ex. 514) to Robert Ecoffey, Director, BIA Office of Law Enforcement Services in Albuquerque, New Mexico, including a copy of the November 21, 2001 tribal Resolution. That letter again referred to the "prank" engaged in by Spokane BIA police officers and the conduct of that investigation by Agent Garvais. The letter further stated that "these matters appears to involve both ethical and legal violations by Investigator Garvais and all those in his chain of command up to and including District V Commander Ed Naranjo." (Ex. 514). The testimony clearly establishes that the BIA commenced its investigation of Garvais solely by reason of the demands of the Spokane Tribal Council. The BIA's actions included the subsequent suggestion by the BIA of the filing of Tribal Court charges against Garvais.

Acceding to the demands of the Spokane Tribal Council, the BIA transferred Agent Garvais from the Spokane Indian Reservation to Montana and then Wyoming, terminated

ORDER - 4

the investigation of the tribal patrolmen who had admitted theft of the car radios and equipment, and reinstated those officers. The legal relationship between the Spokane Tribe of Indians and the BIA on the Spokane Reservation was not made clear during the trial of this matter, however, what was absolutely clear to the court was that the BIA was intimidated by the Tribal Council. The BIA terminated its investigation and prosecution of the radio thefts, and in turn, instituted a criminal investigation into the accounting by Agent Garvais of drug buy funds.

The Internal Affairs Division of the Office of Law Enforcement Services of the BIA opened an investigation and assigned Albuquerque based investigator David Little in April 2002. The "Notice of Allegation" prepared by Agent Little at the initiation of the investigation described the allegations he was to investigate as violations of federal criminal law. It cited provisions of the federal criminal code, 18 USC §§ 495 (forgery), 287 (false statements), 654 (embezzlement and theft), 1001 (fraud and false statement). (Ex. 3). Little could not testify to, nor is there any documentation in the investigative report, as to the basis for the *criminal* allegations. No independent evidence of wrongdoing by Garvais existed at the time. Upon questioning from the court as to whom Agent Little had talked to upon being assigned the investigation, he admitted to having talked with Naranjo. Naranjo testified in his deposition, however, that he was not involved in the investigation of allegations of mishandling of drug money and that he did not know whether any of the allegations being made by the Tribe were true.

Despite his awareness of the Tribe's irritation with Garvais, the Tribe's Resolution, and Peone's letter, Little documented on the Notice of Allegation that the complaint against Garvais came not from the Tribe, but from Naranjo. (Ex. 3). In fact, there is not a single discussion or mention in the entire 248-page investigative report as to the origins of the complaint against Garvais.

The court finds that from the time of the commencement of the "investigation" by Agent Little, it was his intent and that of the BIA to refer the criminal allegations for

ORDER - 5

prosecution by the United States and/or the Spokane Tribe. In both his testimony before this court and in his deposition testimony Agent Little stated that from the beginning, from the time he was initially assigned the investigation, it was his intent to refer it to a prosecuting authority. Agent Little testified at trial and in his deposition:

> Question by Burns: "From the time you were initially assigned the investigation it was your intention to refer it to a prosecuting authority, correct?"
>
> Answer by Little: " Yes, sir."
>
> Question: "Independent of what you ever found, even before you conducted the investigation, you intended to refer it to a prosecuting authority, correct?"
>
> Answer: "Yes sir."
>
> Question: "So regardless of what you were ultimately to find in the investigation, this investigation was going to a prosecuting authority, correct?"
>
> Answer: "If I recall rightly, yes sir."

While Agent Little subsequently testified that he had "misspoke" concerning the foregoing, it is the court's finding that in fact at the time the matter was assigned to Agent Little, it had been determined that the allegations against Agent Garvais would, in fact, be referred for prosecution to appease the Tribe and retaliate against Garvais for his appropriate investigation of the patrol officers.

The retaliatory origin of the allegations against Garvais was never investigated or even mentioned in the report of BIA Agent Little. Instead that report (Ex. 508) concluded that Agent Garvais failed to properly document the expenditure of drug "buy" monies, that he had made false statements on search warrant affidavits, that he had forged documents, and had utilized some of the drug fund monies for personal expenses. However, as explained in more detail below, the report totally relied upon the unverified statements of informants including drug informants and Garvais's former wife, to support the claims against Garvais, in contradiction to the statements of Garvais. As found by First Assistant United States Attorney James Shively in his thorough and well-reasoned ten page, single-spaced declination letter of June 30, 2003 (Ex. 9), insufficient evidence

ORDER - 6

existed upon which to even file criminal charges against Agent Garvais. That determination of insufficiency of evidence against Garvais was subsequently confirmed by United States Attorney James A. McDevitt. (Ex. 13).

Agent Little completed his investigation in December 2002 and forwarded his report to the office of the United States Attorney. A copy of that report was not furnished to Agent Garvais. Agent Little personally discussed the matter with Mr. Shively on several occasions. Those discussions left Agent Little with the impression that Mr. Shively felt there were serious questions as to whether there was sufficient reliable evidence on which to charge Agent Garvais with any offense. Based on those discussions, yet still determined to proceed, BIA officials, on March 6, 2003 forwarded a copy of Agent Little's investigative report to the Spokane Tribe's prosecutor. (Ex. 500). The forwarding of that report for the possibility of tribal prosecution while the matter was still being considered by the United States Attorney's office was, according to Agent Little, most unusual. The Tribe's attorney responded to the BIA letter and on March 19, 2003 forwarded a letter (Ex. 501) to the BIA stating, in part, that the Tribe "hoped to see him prosecuted."

Agent Little then met with the Tribe's prosecutors for the purpose of preparing charges in the Spokane Tribal Court against Agent Garvais. Again, this was a most unusual procedure in that the United States Attorney had not made a final decision on the request for federal prosecution. Agent Little participated in the preparation of the Criminal Complaint filed in Tribal Court, again prior to receiving a final determination from the United States Attorney's office. As a result of the filing of the Complaint in Tribal Court, that court issued a warrant for Agent Garvais's arrest.

Thereafter, Mr. Shively issued a comprehensive declination letter on June 30, 2003 setting forth the reasons for his conclusion that insufficient evidence existed to even charge Mr. Garvais. A copy of that declination letter was forwarded to the Spokane Tribal Court prosecutor.

ORDER - 7

Even though involved in the preparation of the Tribal Court Complaint against Agent Garvais, Agent Little did not discuss with the tribal prosecutor the propriety of the continuance of the Tribal Court prosecution upon receipt of the declination letter by Mr. Shively discussing the unreliability and insufficiency of the evidence. As a result, the Tribal Court warrant remained outstanding.

At the time of Garvais' reassignment to Wyoming from the Spokane Reservation, Garvais and his family resided at Nine Mile Falls, Washington, near the Spokane Reservation. Garvais remained assigned to Wyoming until placed on administrative leave on September 15, 2002, pending the outcome of the BIA investigation. On Saturday, August 9, 2003 while Garvais and his family were participating in family activities on the Colville, Washington Indian Reservation, Garvais was arrested by tribal police on the outstanding Spokane Tribal Court misdemeanor warrant. He was held in custody without bond. On Monday, August 11, 2003 Garvais was brought before the Colville Tribal Court for an "extradition" hearing. The Tribal Court ordered that Garvais be then transported to the BIA detention facility on the Spokane reservation. Agent Little had traveled from Albuquerque, New Mexico for these proceedings. On Tuesday, August 12, 2003, attorney Leslie Weatherhead filed this federal court action seeking, *inter alia*, the release of Agent Garvais from the custody of the Spokane Tribal Court. On Wednesday, August 13, 2003, a detention hearing was held in the Spokane Tribal Court. While heading to that hearing, Mr. Garvais' wife, LaVina Louie, was approached by Agent Little who pointed his finger at her and stated to her that "I'm going to get Duane, whether I have to go tribal, state or federal–I will get him." This court found Lovina Louie to be a credible witness. When testifying during the Defendant's portion of the case, Agent Little did not deny the statements, or was not asked specifically if he made such statements. The sole proffered testimony of Agent Little concerning Ms. Louie was as follows:

Question by Mr. Brouillard: "Let me ask you this. Do you know who LaVina

ORDER - 8

Louie is?"

      Answer by Mr. Little: "I think now I do.  Yes"

      Question: "Okay. Who is she?"

      Answer: "I believe she's Mr. Garvais's wife.."

      Question: "Okay.  Did you know who she was as of the date of the bail hearing back in August of 2003?"

      Answer: "I don't recall knowing who she was or meeting her."

      Question: "All right.  Do you recall ever talking to her?"

      Answer: "No sir."

      Agent Little was neither asked concerning the specific alleged statement testified to by Ms. Louie nor did he specifically deny having made the statement.  The court concludes that in fact Agent Little made the statement testified to by Ms. Louie.

      The Spokane Tribal Court set Garvais' bond on the misdemeanor charges at $10,000, which his family and friends posted, and Garvais was released from custody.

      Thereafter, attorney Weatherhead pursued *habeas corpus* relief from the Spokane Tribal Court charges.  Extensive evidence was introduced and this court found that Garvais was not an "Indian" subject to prosecution in Tribal Court. This court directed the Spokane Tribal Court to dismiss the charges against Garvais, and after first appealing this court's ruling to the Ninth Circuit Court of Appeals, and then withdrawing that appeal, the Tribal Court complied with this court's direction and dismissed all of the charges against Garvais.

      After this court's finding that Garvais was not an "Indian" for Tribal Court prosecution purposes, the BIA then terminated Garvais's employment as a BIA employee stating that since he had been employed with the benefit of an Indian preference, he had been improperly employed.  This action by the BIA was taken despite the fact that persons employed as BIA investigators need not be Indians.  Garvais unsuccessfully appealed his "Indian Preference" dismissal through the administrative process.  In view

ORDER - 9

of that unsuccessful appeal, in this malicious prosecution action Garvais does not seek recovery of past or future wages. He does, however, seek the recovery of damages flowing from his malicious prosecution by the Spokane Tribe and the BIA including the fees and attorney fees incurred. The legal work of Mr. Weatherhead warranted substantially higher attorney fees, however, it appears that Mr. Weatherhead rendered his services primarily on a *pro bono* basis.

The ultimate Finding of Fact in this matter is that the BIA maliciously caused the institution and continuation of unfounded criminal proceedings against Duane Garvais in Spokane Tribal Court in retaliation for the proper performance of his duties in investigating thefts by BIA patrol officers with close connections to the Tribe. As stated, those charges were ultimately dismissed pursuant to the finding of this court that the Spokane Tribal Court did not have jurisdiction over Mr. Garvais.

The court finds that Mr. Garvais and his family suffered substantial emotional distress and turmoil as the result of the wrongful action of the BIA at the behest of and in association with the Spokane Tribal Council and its agents and employees. This emotional distress continued over a period of years, including Mr. Garvais having to seek *habeas corpus* relief in this court. The court finds that just compensation to Mr. Garvais is in the amount of $400,000 plus the sum of $13,102.66 billed by Mr. Weatherhead's law firm Witherspoon, Davenport, & Toole. (Ex. 16).

## II. DISCUSSION

### A. Federal Tort Claims Act

The Federal Tort Claims Act provides that the United States is liable "if a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) & 2674. All of the acts/omissions that form the basis of this Complaint occurred in the state of Washington. Accordingly, the law that will be applied in this case is the substantive law of Washington state. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 592 (1962).

ORDER - 10

**B. Malicious Prosecution**

In Washington state, in order to succeed in an action for malicious prosecution, the plaintiff must prove five elements: "(1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damages as a result of the prosecution." *Clark v. Baines*, 150 Wash.2d 905, 911 (2004). "Although the malicious prosecution plaintiff must prove all required elements, malice and want of probable cause constitute the gist of a malicious prosecution action, . . . as such, proof of probable cause is an absolute defense." *Id.* at 912 (internal citations omitted). "Actions for malicious prosecution are not favored in the law, although they will be readily upheld when the proper elements have been established." *Id.* at 911. After all, "...no man shall be charged with a crime, exposed to the danger of a conviction, and subjected to the expense, vexation, and ignominy of a public trial merely for the gratification of another's malice or ill will." *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash.2d 485, 496-97 (1942).

**1. Instituted or Continued by the Defendant**

The Defendant United States can be found liable for malicious prosecution only if the Plaintiff has demonstrated the Defendant *instituted* or *continued* the underlying criminal proceedings against the Plaintiff. "Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy, v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)(internal citation omitted). However the protection provided for informers can be lost when that informer or investigating officer provides false information or demonstrates a desire, direction, request or pressure for the initiation

ORDER - 11

of criminal proceedings.   Restatement (2d) Torts § 653, *comment g; See also, Blankenhorn v. City of Orange*, 485 F.3d 463, 482-83 (9th Cir. 2007) (holding that a district attorney's reliance on false statements are sufficient to state a § 1983 claim).  The test of liability in such an action is whether the  person takes an "active part" in setting the law in motion.  As the Restatement indicates, "[a] private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings."  Restatement (2d) Torts § 655 (emphasis added).  The comments to this section note that it "applies ... when the proceedings are initiated by a third person, and the defendant, knowing that there is no probable cause for them, thereafter takes an active part in procuring their continuation."  *Id*., cmt. b; *see also Ware v. U.S.*, 971 F.Supp. 1442, 1462 (M.D.Fla. 1997); *Pierce v. Gilchrist*, 359 F.3d 1279, 1295 (10th Cir. 2004).

The preponderance of the evidence established the fundamental and active role of Agent Little and the BIA in initiating and continuing the tribal prosecution of Garvais.  The BIA and Agent Little were instrumental in, desired, directed and urged both the initiation and continuation of the prosecution of Garvais.   Importantly, the Tribe requested the BIA to conduct an internal review of the conduct of its employee -- there is no evidence that the Tribe initially requested a criminal investigation or was then independently seeking a criminal prosecution of Garvais.  Rather, it was the BIA which made the decision to designate the investigation as criminal from its very inception, that chose what criminal charges to pursue, and then sought out prosecution by the Tribe, as found *supra*. Agent Little testified it was his intention from the beginning to turn over what ever information he gathered to a prosecuting authority.  After Agent Little had learned that the United States might not prosecute, but while the matter was still under review by the United States Attorney's office, the BIA sought tribal prosecution.  Contrary to established practice, the BIA then sent a letter and the investigative report to

ORDER - 12

the Tribe, claiming the BIA had determined there was "sufficient evidence...uncovered to support the allegations" and requesting "prosecutorial determination."   The BIA prevailed upon the tribal prosecutors to institute tribal charges, as the BIA and Agent Little 1) were anxious to have Garvais' case handled; 2) knew the tribe would be receptive as it requested the investigation and was irritated with Garvais for investigating the patrol officers; and 3) knew that the information supplied in the investigation would be relied upon in the prosecutor's decision to commence prosecution.

Though prosecutorial independence is presumed and ordinarily evident, the evidence leaves no doubt that without the BIA and Agent Little's fervent and malicious efforts there would have been no prosecution of Garvais.   Margo Hill and Lorraine Parlange testified that at the time of Garvais' prosecution, the Tribe's legal department was small, had very few resources, and had a large number of responsibilities in representing a government with "lots of issues."  Hill, a member of the Spokane Tribe and lifelong resident, testified she performed mostly civil and supervisory work. Parlange had primary responsibility for criminal prosecutions and testified she had a good working relationship with Garvais.  The Tribe relied exclusively on the BIA for law enforcement services.   The attorneys testified that they relied solely upon the investigative report and Agent Little in filing the Complaint against Garvais. Though Hill performed *civil* work and had never reviewed a case for forgery, theft, embezzlement or fraud, she prepared the Criminal Complaint with Little's assistance.   She testified that she reviewed the investigation and its list of "overt acts" contained in the report (Ex. 14 at 4-5), looked at the code, and then drafted the Complaint. The Tribe routinely followed and exclusively relied upon the recommendations of BIA officers-- the BIA knew this and this case was no exception.

It was clarified at trial that the tribal prosecutors were in fact provided a copy of the First Assistant United States Attorney James Shively's declination letter and that the prosecutors discussed it with Agent Little.   Nevertheless, even after Agent Little was

ORDER - 13

advised by Shively's competent and thorough analysis that there was insufficient evidence to support criminal charges and the reasons why, Agent Little performed no follow up investigation to provide the information necessary to correct the inadequacy of the evidence.   Instead, frustrated by the Shively declination letter, he continued in his relentless support and pursuit of the tribal prosecution.   This despite his knowledge that Hill, with little criminal experience, was relying exclusively upon his work and heeding his lead.   Given the contents of the Shively letter, Agent Little's failure to either conduct any follow up investigation or to even discuss the propriety of the tribal charges with tribal counsel, constituted bad faith conduct which was instrumental in preserving the continued wrongful prosecution of Garvais.

Those who deliberately supply misleading information to those who prosecute that influences the decision to prosecute cannot escape liability by pointing to decisions of prosecutors. *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).   The court notes that significant information in Agent Little's possession, but omitted from the investigative report which the Tribe relied upon, were the Warning and Assurance forms the agents utilized to obtain information from Garvais and all information/documents related to the origin of the complaint against Garvais.

The court finds the BIA's active role and causation in the tribal prosecution of Garvais was clearly established.   Plaintiff has demonstrated by a clear preponderance of the evidence that the criminal proceedings against Plaintiff were instituted and continued by the BIA, an agency of the Defendant United States of America.

**2. Favorable Termination**

To establish a malicious prosecution claim, Plaintiff must also establish that the underlying proceedings against him were terminated on the merits in his favor, or were abandoned. *Clark v. Baines*, 150 Wash.2d 905, 84 P.3d 245, 248 (Wash. 2004)(emphasis added). In its trial brief, the United States took the position that the dismissal of the tribal charges for lack of jurisdiction pursuant to Garvais' successful habeas petition does not

ORDER - 14

meet this element because the dismissal did not relate to the merits of the criminal case. Though the issue of whether a given type of termination was favorable to the accused, or was abandoned, is a matter of law for the court, this issue was neither disputed or raised by the United States at the summary judgment stage. The court itself requested post-trial briefing on this issue. In effect, the United States now contends that a person charged with an offense must waive a valid claim of lack of jurisdiction in order to preserve his or her malicious prosecution claim. The court rejects that argument.

The court also rejects the United States' contention (at Ct. Rec. 226 at 4, 8) that the Plaintiff must prove the proceedings ended "on the merits." Indeed, the oft-cited elements from *Peasley*, *supra*, require the Plaintiff to prove either an adjudication of the merits *or* an *abandonment* of the proceedings. As it is undisputed the merits of the prosecution against Garvais were never tried, it is the abandonment prong which is at issue in this case. There is no Washington case authority with a developed discussion of this element, or more specifically, the abandonment prong. Washington cases have involved fact scenarios in which the favorable termination element was not a point of discussion, perhaps in part because courts have emphasized that the "gist" of malicious prosecution claims are the elements of malice and want of probable cause. *See Clark v. Baines*, 150 Wash.2d. 905, 912 (Wash. 2004).

Treatises generally refer to this element as the "favorable termination" element because a common thread among authorities and state courts is the requirement that the original proceeding terminate in favor of the plaintiff. *See* Restatement (2d) Torts § 658. The well-settled purpose of the "favorable termination" element has been to eliminate the risk of conflict between two simultaneous criminal and civil judicial proceedings. It is said the complaining party could not show any damage from the institution of criminal proceedings until their termination. The "favorable termination" requirement also supports the policy that civil tort actions are not the proper vehicle for challenging the validity of criminal convictions.

ORDER - 15

For purposes of the analysis here it is helpful to dissect the element into its two main components, the "finality" component and the "favorable" component. These components are not necessarily obvious from the way the law in the State of Washington is interpreted. The "finality" component ensures that the underlying proceedings are terminated. There can be no dispute that the Tribal Court criminal proceedings against Plaintiff were finally and favorably terminated. The dismissal of the charges because the Tribe lacked personal jurisdiction over Garvais removed any possibility of the Tribe reviving new proceedings against Garvais. This prosecution could <u>never</u> be re-instituted. Garvais' habeas proceedings finally ended the prosecution against him. This distinguishes the facts here from the hypothetical scenario where a prosecutor abandons proceedings to permit the improvement or re-institution of charges elsewhere and other charges are thereafter instituted within a reasonable time. *See* Restatement (2d) of Torts § 660, comment g. After the Tribe's dismissal, the charges could not be further pursued against Garvais and in fact, the United States Attorney and his First Assistant had already found insufficient evidence to prosecute. The dismissal of the prosecution in this case does not implicate any of the concerns regarding the danger of collateral attack or inconsistent judgments. The finality of the dismissal of the prosecution in this case supports the court's conclusion that the dismissal constitutes a termination as to form the basis of a malicious prosecution claim.

The real "termination" dispute here concerns the second component, which is whether the termination in this case is to be treated as favorable for the purpose of a malicious prosecution action. This court and the overwhelming authority from other courts and commentators agree that not just *any* termination, withdrawal, dismissal, discontinuation, or abandonment of proceedings suffices as a basis for a malicious prosecution claim. The reason there must be a "favorable" termination is because an adverse determination in the underlying litigation is generally thought to be conclusive of probable cause for instituting the underlying litigation. 30 A.L.R. (4th) 572 at § 2.

ORDER - 16

The Restatement (2d) of Torts, section 659 catalogues events constituting a "favorable termination" in a criminal proceeding as follows:

(a) a discharge by a magistrate at a preliminary hearing, or
(b) the refusal of a grand jury to indict, or
(c) the formal abandonment of the proceedings by the public prosecutor, or
(d) the quashing of an indictment or information, or
(e) an acquittal, or
(f) a final order in favor of the accused by a trial or appellate court.

Restatement (2nd) Torts § 659.

There are several types of terminations which do not qualify as sufficiently "favorable", since they are fundamentally inconsistent with innocence. The Restatement (2d) §§ 660 and 661 catalogue the following:

§ 660.  Indecisive Termination of Proceedings
A termination of criminal proceedings in favor of the accused other than by acquittal is not sufficient termination to meet the requirements of a cause of action for malicious prosecution if:
(a)    the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or
(b)    the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or
(c)    the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or
(d)    new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.
§ 661. Impossibility of Bringing the Accused to Trial

The formal abandonment of proceedings by a public prosecutor is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial.

As stated in the comment to § 661, the situations covered by § 661 are circumstances in which the impossibility or impracticability is due to circumstances which make trying the accused practically or factually impossible – not legally impossible.  For example, such as when the accused has fled the jurisdiction, where extradition is not available, where illness might make the journey fatal for the accused, or a diligent search fails to locate the accused.  The dismissal of the case for lack of jurisdiction does not meet any of the categories of indecisive exceptions recited in § 660 or § 661 of the Restatement.

There is strikingly little precedent discussing whether a discharge in habeas corpus

ORDER - 17

proceedings has the effect of favorable termination of criminal proceedings.  No federal or state case has decided whether the disposition of criminal proceeding pursuant to a habeas petition for lack of jurisdiction is *per se* "favorable" or "not favorable." Related authority which exists reveals a divergence in results based upon the wide differences in facts.  The facts here present yet another unique scenario unlike any other case the court has reviewed.   Accordingly, the court cannot rely upon general rules regarding the form of the disposition of the prior proceeding, but rather must carefully analyze the unique circumstances under which the termination herein was entered.

The court recognizes that, generally, where the underlying proceeding was a ***civil*** proceeding, the vast majority of jurisdictions have followed the rule that a dismissal of the underlying *civil* matter on technical or procedural grounds, such as for lack of jurisdiction, is not a favorable termination because the termination cannot be said to reflect on the merits or propriety of the action.  *See e.g., Lackner v. LaCroix*, 25 Cal.3d 747, 159 Cal.Rptr. 693, 602 P.2d 393, 394 (1979); *Parrish v. Marquis,* 172 S.W.3d 526 (Tenn. 2005)  The rationale for this conclusion is that a dismissal for lack of subject matter jurisdiction is not res judicata as to the merits of the cause.  Some courts have refused to follow the substantive/procedural distinction even in the civil context.[2]

---

[2] *See e.g., Hammond Lead Prod., Inc. v. American Cyanamid Co.*, 570 F.2d 668, 673 (7th Cir.1977) (applying New Jersey law and holding that dismissal for lack of venue satisfied the favorable termination requirement), or reject any inquiry into whether a termination not on the merits was based on substantive or procedural grounds. *See DeLaurentis v. City of New Haven*, 220 Conn. 225, 597 A.2d 807, 820 (Conn. 1991) (stating that termination need not indicate innocence or lack of liability); *Christian v. Lapidus*, 833 S.W.2d 71, 74 (Tenn.1992) (rejecting distinction between terminations on procedural and substantive grounds); *Turman v. Schneider Bailey, Inc.*, 768 S.W.2d 108 (Mo.App. 1988)(dismissal of replevin suit because the amount in dispute exceeded the

ORDER - 18

However, the fact the underlying proceeding in this matter was *criminal* is important, as the decision that the Tribal Court lacked jurisdiction had the "res judicata" effect of barring further criminal prosecution of Garvais.

The inability to proceed to the alleged criminal merits due to a lack of jurisdiction does not *necessarily* imply a lack of reasonable grounds for prosecution or reflect one way or another on the accused's innocence. However, where the nature of the termination of the criminal proceedings is neither indicative of or inconsistent with factual innocence, then the court's conclusion on the favorable termination element should redound in favor of the accused. *See e.g. Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, 753 (N.Y. 2000). In this circumstance, the favorable termination element should not be the decisive factor in rejecting the claim. Indeed, it is universally recognized, including in Washington, that the gravamen of malicious prosecution actions is malice, the lack of probable cause, and the injury resulting therefrom. The malicious prosecution claimant must still prove by a preponderance of the evidence these critical elements which tend to serve the purpose of ensuring the tort is only made available to the wrongly accused. *See Kroger Co. V. Puckett*, 351 So.2d 582, 587 (Ala.Civ.App. 1977)(a termination on the basis of a procedural or technical defect is considered sufficiently in the accused's favor so long as the particular proceeding could not have been revived after termination*); Weidlich v. Weidlich*, 30 NY.S.2d 326, 331 (N.Y.Sup. 1941)(action for malicious prosecution could be maintained based upon a proceeding where the court had no jurisdiction if the proceedings are malicious and unfounded, and without probable cause...").

Furthermore, the court cannot ignore the possibility that a vengeful prosecutor or individual, operating without regard to the lack of jurisdiction, could wrongly institute

---

judge's jurisdiction was held a favorable result because the circumstances indicated "no real possibility" that the replevin suit would be refiled);

ORDER - 19

or cause the institution of criminal proceedings against an innocent person, causing them to wrongfully suffer through court proceedings and incur damages by the process. To adopt the conclusion that such an instance was not a favorable termination or abandonment would effectively leave a criminal defendant whose case was dismissed for lack of jurisdiction with no remedy for a maliciously instituted suit. Yet the injury resulting from baseless charges maliciously pursued in a court with no jurisdiction is on that account no less than if jurisdiction had existed. *See Stubbs v. Mulholland*, 168 Mo. 47 (1920)(citing Prof Greenleaf, 2 Greenl. Ev. (14th ed.) § 449.)("Nor is it material that the plaintiff was prosecuted by an insufficient process, or before a court not having jurisdiction of the matter; for a bad indictment may serve all the purposes of malice as well as a good one, and the injury to the party is not on that account less than if the process had been regular, and before a competent tribunal.").

Moreover, where the Indian Civil Rights Act, 25 U.S.C. § 1301 et seq., authorizes the use of the writ of habeas corpus to contest tribal court proceedings, the law should not require one who is potentially falsely and maliciously criminally accused to proceed to trial and forfeit a statutory or constitutional right to challenge jurisdiction. A person should not be required to relinquish such a constitutional or statutory privilege in order to preserve his claim for civil compensation for malicious prosecution. Courts have held similarly in the context of dismissals brought about by an accused's assertion of the right to speedy trial. *See e.g. Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, 753 (N.Y. 2000) (Under New York law, a criminal proceeding is terminated favorably to the accused so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused and "there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense."); *Murphy v. Lynn*, 118 F.3d 938 (2nd Cir. 1997), cert denied, 522 U.S. 1115 (1998); *Van v. Grand Casinos of Mississippi, Inc.*, 724 So.2d 889 (Miss. 1998). As the New York Court of Appeals noted in *Smith-Hunter*, the law "should not require one who is falsely

ORDER - 20

and maliciously accused to proceed to trial-incurring additional financial and emotional costs-as a prerequisite to recovery for malicious prosecution." 95 N.Y.2d at 199.

The court rejects the notion that the abandonment prong encompasses only circumstances which affirmatively establish actual factual innocence of the accused. No court applying Washington law has so construed the law. In this case, the criminal proceeding was finally terminated pursuant to a favorable decision on Garvais' habeas corpus petition. The circumstances of the Tribal Court's dismissal for lack of jurisdiction are not inconsistent with Garvais' innocence. Accordingly, the discontinuation of prosecution in this case is the type of formal abandonment contemplated by the tort law, serving its purposes, and satisfying Garvais' burden of establishing this termination element.

### 3. Want of Probable Cause

#### a. Legal Standard

The second element of a malicious prosecution claim that a Plaintiff must establish is the want of probable cause for initiating or continuing the prosecution. If probable cause is established, the action fails for probable cause is a complete defense to an action for malicious prosecution. *Peasley*, 13 Wash.2d at 499. While generally, the dismissal of criminal charges establishes a prima facie case that there was no probable cause (*id*.), the dismissal in this case was neither indicative of the existence *or* lack of probable cause. Therefore, while it is permissible for the court to consider the dismissal along with other evidence of want of probable cause, the dismissal itself is not prima face evidence thereof. Plaintiff must demonstrate the want of probable cause by independent evidence.

The probable cause element focuses entirely on the propriety of police and prosecutorial conduct. The existence or non-existence of probable cause is determined by an objective evaluation of what the police and/or the prosecutor knew at the time of arrest or prosecution. *Hanson v. City of Snohomish*, 121 Wash.2d 552, 575 (1993).

ORDER - 21

Therefore, Agent Little's subjective opinion is not relevant to the court's determination of probable cause.

> Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed.

*State v. Gluck*, 83 Wash.2d 424, 426-427, 518 P.2d 703 (1974); *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash.2d 485, 509, 125 P.2d 681 (1942).

The May 7, 2003 Criminal Complaint filed in Tribal Court against Garvais included 22 charges: 6 counts of forgery; 12 counts of fraud; 1 count of embezzlement; 1 count of misappropriation of tribal property; and 2 counts of perjury.  Plaintiff asserts all 22 charges were baseless.  Just as multiple federal Circuit Courts have concluded, in examining a malicious prosecution claim based on more than one charge, the court must "separately analyze the charges claimed to have been maliciously prosecuted."  *See Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007); *Holmes v. Village of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007); *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998); *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)((holding that a finding of probable cause on the charge of disorderly conduct did not foreclose a malicious prosecution action on charges requiring "different, and more culpable, behavior"); *Rivera-Marcano v. Normeat Royal Dane Quality A/S*, 998 F.2d 34, 38 (1st Cir. 1993); *see also Crowley v. Katleman*, 8 Cal.4th 666, 34 Cal.Rptr.2d 386, 881 P.2d 1083, 1088 (1994) ("it is not necessary that the whole proceeding be utterly groundless, for, if groundless charges are malicious and without probable cause, coupled with others which are well founded, they are not on that account less injurious, and, therefore, [even one charge can] constitute a valid cause of action."); *Bertero v. Nat'l Gen. Corp.,* 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608 (1974) (approving a jury instruction allowing the jury to find for the plaintiff in a malicious prosecution action even if only one of the three theories of liability pleaded in the underlying action lacked probable cause).  The rationale for this charge-by-charge

1    approach is logical.  As stated in *Holmes*,

> "...when it comes to prosecution, *the number and nature of the charges matters*: the accused must investigate and prepare a defense to each charge, and as the list of charges lengthens (along with the sentence to which the accused is exposed), the cost and psychic toll of the prosecution on the accused increase.  *See id.* at 84, 85; Jacob Paul Goldstein, Note, *From the Exclusionary Rule to a Constitutional Tort for Malicious Prosecutions*, 106 COLUMBIA L.REV. 643, 645 (2006) (quoting *Savile v. Roberts*, 91 Eng. Rep. 1147, 1149-50 (K.B.1698) (Holt, C.J.) (describing the various injuries underlying a malicious prosecution claim)).  At the same time, when an officer prepares and signs a criminal complaint, he typically will have more of an opportunity to reflect on the nature and ramifications of the accused's conduct than he did in making the arrest.  It is reasonable to demand that each charge that a police officer elects to lodge against the accused be supported by probable cause.  Otherwise, police officers would be free to tack a variety of baseless charges on to one valid charge with no risk of being held accountable for their excess."

10    511 F.3d 673, 682-83 (7th Cir. 2007)(emphasis added).

11    It is the court's obligation to apply Washington law.   The court has found no

12    Washington case (and the parties did not discuss this point) that squarely addresses

13    whether the criminal charge-by-charge analysis on probable cause is employed in

14    Washington.   However, in the civil context, Division 1 of the Washington Court of

15    Appeals in *Brin v. Stutzman*, 89 Wash. App. 809, 951 P.2d 291 (1998) stated that it was

16    expressly "leav[ing] open" the possibility of bringing a malicious prosecution claim

17    based upon  an "invalid severable cause of action included in a complaint asserting other

18    valid severable causes of action." 89 Wash. App. at 821. A federal court applying

19    Washington law must apply the law as it believes the Washington Supreme Court would

20    apply it. *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir.

21    2003). "[W]here there is no convincing evidence that the state supreme court would

22    decide differently, a federal court is obligated to follow the decisions of the state's

23    intermediate appellate courts." *Vestar Dev. II, LLC v. Gen. Dynamics Corp*., 249 F.3d

24    958, 960 (9th Cir. 2001) (*quoting Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537,

25    1545 (9th Cir. 1996) ( internal quotation marks omitted )).  This court has no reason to

26    doubt that the Washington Supreme Court, if presented with the question, would follow

27    this charge-by-charge approach to the probable cause element.

28    ORDER - 23

*b. The Charges*

The court now turns to the individual charges.  The evidence offered at trial revealed no dispute regarding the information available to the BIA at the time criminal proceedings were instituted and continued. The testimony established the proceedings were instituted in Tribal Court based solely on the information provided by the BIA in the investigative report.  The deficiencies in the report were thoroughly analyzed in the declination letter of First Assistant United States Attorney Shively.   Though the testimony at trial evidenced that Agent Little and the tribal prosecutors were irritated by the declination letter and certain aspects of its content, there is no evidence which causes this court to question the accuracy or adequacy of Mr. Shively's analysis. The court finds that Mr. Shively was the only authority to have actually evaluated the information to discern whether criminal action was justified. Though blatantly evident even beforehand, after having reviewed the Mr. Shively's analysis, no person could have honestly and reasonably concluded that there was probable cause for any of the criminal charges lodged against Garvais.

Agent Little's internal affairs investigation consisted of interviews with Garvais and the informants identified by Garvais, and an examination of the money sheets and receipts maintained by Garvais.   The evidence showed that in the first few months of being in federal law enforcement and being asked to investigate drug offenses on the Spokane Reservation, Garvais operated with virtually no supervision or guidance.  To manage the drug fund monies provided to him from various sources, he created his own forms and bought his own receipt books because none were provided to him.  Agent Little's investigation confirmed these facts.   The investigative report concludes that Garvais was not following BIA policies and procedures on how to handle informants and drug monies.  The receipts for payments did not have witness signatures and several of the receipts were not signed by the recipients.  Some of the BIA confidential informant agreements were unsigned by the informants and none were signed by a supervisor.  In

ORDER - 24

his interview with Agent Little and Agent Noseep, Garvais attested to the accuracy of the receipts, disclosed the identity of the confidential sources he had used, and also admitted that sometimes he documented matters without requiring signature because he either did not have the material with him or some informants were too paranoid to sign anything. Following the interview with Garvais, BIA agents interviewed the confidential sources identified by Garvais.

**Receipts.** Fifteen of the charges filed in the Criminal Complaint were based upon the investigative report's conclusion that Garvais had "falsely" documented monies expended in drug investigations and "forged" receipts documenting payments made to informants. Three receipts identified by the investigation recorded payments from Garvais to Anne Numkena. These payments provide the basis of **<u>five</u>** of the twenty-two charges (counts 2 through 4 (forgery); counts 9 and 10 (fraud)). The total of these three receipts was $110, which were for "gas money and info". Seven receipts identified by the investigation recorded payments from Garvais to David Palmer for drug buys, a salary and miscellaneous expenses. These receipts provided the basis of **<u>nine</u>** of the twenty-two charges (counts 5 and 6 (forgery); counts 12 through 18 (fraud). The total of these seven receipts was $960.

Agent Little's interview of Anne Numkena revealed she first met Garvais when she was the victim of a home invasion robbery by intruders believed to have been looking for drugs. She acknowledged two subsequent interviews with Garvais, which corresponded in time with the receipts documented by Garvais. Numkena admitted having met Garvais a third time when an acquaintance had broken into her house and had been living there in her absence. It was also believed the acquaintance was selling drugs. This meeting corresponded in time with the third receipt documenting a payment to Numkena. However, when questioned by Agent Little, Numkena denied having been an informant working for Garvais and denied receiving payments from Garvais. Based on Numkena's statement of denial, Agent Little concluded the receipts were forged and fraudulently

ORDER - 25

submitted.  This conclusion provided the basis for the criminal charges.

Likewise, Agent Little's conclusion and the resulting charges in regards to the receipts for payments made to David Palmer were based entirely upon the statements of David Palmer.  Palmer acknowledged having worked undercover for Garvais for a period of at least three months, he acknowledged receiving a salary and some payments.  He denied having received others and could neither deny nor confirm yet others.  In several instances, Palmer stated he had returned the money to Garvais after failed attempted drug purchases, yet Garvais' money sheet did not reflect adding the balance back into the drug fund.  Based on Palmer's statements as to these particular seven payments, Agent Little concluded the receipts were forged and fraudulently submitted and nine criminal charges were lodged based thereon.

**The Informant Agreement.** The information provided by Numkena in her interview also provided the basis for Agent Little's conclusion that Garvais had "falsified entries on an Informant Agreement document," which provided the basis for **two** of the twenty-two charges, count 1 (forgery) and count 8 (fraud).  Numkena had in her interview denied signing up as an informant or giving Garvais permission to sign her up.  In his interview Garvais had admitted he had prepared the agreement for his files because she was too paranoid to sign anything.

**Warrant Affidavits**.  The investigative report also alleged that Garvais had falsified information in two search warrant affidavits submitted to Spokane Tribal Court, which provided the basis for **four** of the criminal charges lodged against Garvais (counts 7 (forgery); 11 (fraud); 21 (perjury); and 22 (perjury)).

Counts 7 (forgery) and 21 (perjury) pertain to an affidavit dated February 14, 2000 related to a drug investigation.  (Ex. 13 at 153).  The affidavit states: "On 01-13-200 (00-002) who is a confidential informant for the Department of Interior, Bureau of Indian Affairs purchased Crack Cocaine I.A.W. [in accordance with] BIA policy."  The BIA's internal investigation revealed that the purchase was made not by 00-002, but rather by

ORDER - 26

someone else, who had not completed a BIA informant agreement.  The other remaining details of the narcotics trafficking activity contained in the affidavit was factually accurate.  Based on this apparent mistake, the BIA's investigation concluded the purchase "was not done in accordance was [sic] BIA policy as outlined in the affidavit" and Garvais was charged with forgery and perjury.

Counts 11 and 22 related to a search warrant affidavit dated May 8, 2000.  In the affidavit, Garvais attested that certain information about narcotics trafficking was provided by confidential informant, Numkena.  The narcotics trafficking information in the affidavit was factually accurate.  Numkena, when interviewed by Agent Little, denied having given the information contained in the affidavit to Garvais or working as a confidential informant.  Based on Numkena's denial that she provided the information, Garvais was charged with fraud and perjury.

**Global Counts.**  Count 19 (embezzlement) and count 20 (misappropriation of tribal property) are the global counts based on the facts of all the other charges.  In addition, these counts are based upon an interview with Garvais' ex-wife, Dion Fry, with whom Garvais was married and divorced twice.  Fry stated she recalled two times when Garvais had suggested he would use money in his work briefcase for personal use.  On June 7, 2003, in a recorded interview, the following was asked by Agent Little and answered by Fry:

> Q:   And you said that Duane kept his money – the drug money in the black brief case?
> A:   Briefcase, yeah. And that was mostly pretty much always in his vehicle, his issued Explorer, whatever he had.
> Q:   Okay. Now, did you ever know of him, or ever see him, use any of that money or taken any of the money?
> A:   I don't know if and when he used it, but he'd ask for money, and I'd say No, I paid the bills or went shopping or whatever, cause he would take money out, too, and sometimes he would spend some that I had already spent, you know, like on the bills or house or shopping or whatever, and then he said, You know what – a couple of times the briefcase was in the house when he would be doing paperwork and stuff like that.  And he said, **Well, I'm just gonna use this, and then I'll put it back in there**.  So I didn't know if anything, if that was, you know, right or wrong, anyway, if he's saying he's gonna put it back in there.  So –

ORDER - 27

...
Q:       And did you actually see him use – take that or –
A:       Yeah, yeah.
Q:        On how many occasions?
A:       Probably no more than twice. It was just a couple of times that –
Q:       And what was the amount?
A:       I think it was – I don't know, cause I didn't see how much he did or saying how much he was gonna. **But I think he said he was gonna do it**, I think it was like 50 that one time, and I don't know if it was like just 20 the other time.  So that's what he said.
Q:       Okay. That's what he said?
A:       Yeah, yeah.  **I wasn't standing there watching him, you know, take the money out or anything.  And he didn't give it to me**....

(Ex. 14 at 211-213)(emphasis added).  Based on this interview, the investigation concluded that "Garvais used the drug investigative funds for personal use on at least two occasions."  (Ex. 14 at 5).

*c. Discussion*

<u>I. The Investigative Report Lacks Any Evidence of Criminal Intent</u>

A crime is committed only in the concurrence of prohibited conduct and a culpable state of mind.  *Morissette v. United States*, 342 U.S. 246, 249(1952)("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand).  As *Morissette* eloquently explains:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.[] A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

342 U.S. at 349, 251 (footnote omitted).  Each crime has its own type of culpable mental state (often called "mens rea").  The recognized culpable mental state is specified in the law defining the offense.   The Criminal Complaint in this case contained allegations of forgery, fraud, embezzlement, misappropriation of tribal property, and perjury. Reading the Complaint, the charge of forgery required proof of the *intent* to defraud.  The charge of fraud requires poof of *willful* misrepresentation or deceit.  The charge of embezzlement

ORDER - 28

required proof of a) appropriation of property not his own with b) the "*intent* to deprive the owner thereof." The charge of misappropriation of tribal property required *willful* or *knowing* embezzlement and the intent to convert the funds to his own use or use of another. The charge of perjury required proof of *willful* and *deliberate* false statements and *knowledge* the statements were untrue. Essentially, all of these crimes required not only conduct, but evidence that it was Garvais' *conscious objective* or *desire* to defraud, misrepresent, deprive the Tribe of monies, convert monies to his own use, and to make false statements.

There is no evidence contained in the investigative report or at any other time presented, which would have "warrant[ed] a man of reasonable caution" to believe that Garvais acted with the requisite criminal intent to have committed any of the crimes charged in the Criminal Complaint. This point was made <u>repeatedly</u> throughout Mr. Shively's letter. (Ex. 9 (e.g. "Such an error could easily be explained as a typographical error, simple negligence, confusion, mistake or inadvertence.")). The evidence in Little's investigative report demonstrates not criminal culpability, but rather a systemic failure within the BIA which permitted agents to do as they wish without proper supervision and management. The lack of evidence of criminal intent deprives these criminal charges of probable cause.

<u>ii. The Investigative Report Lacked Sufficiently Reliable Information of Criminal Conduct</u>

Besides a culpable state of mind, a crime is not committed without an act. In order for probable cause to exist, the alleged act must be based upon reasonably trustworthy information. Nineteen of the 22 charges are based entirely upon uncorroborated statements of Anne Numkena and David Palmer, drug informants, whose statements contradicted those of Garvais as well as the paper record. Though the investigations' conclusions hinged on the credibility of these informants, the reliability and veracity of these informants or the informants' statements were never investigated, were not known

ORDER - 29

to the lead investigator from Albuquerque, and were never mentioned or established in investigative report.  Just as Agent Little ignored the retaliatory motivation for the instigation of the internal affairs criminal investigation of Garvais, Agent Little ignored the character of the sources from which his information was derived.

Most informants with knowledge of drug trafficking are to some extent involved it in it themselves, warranting a certain amount of distrust.  Agent Little had no familiarity with the informants from whom he gained information.  Even without further investigation, as Mr. Shively's letter also points out in even further detail, existing information made it more likely that the informants' statements were incorrect as opposed to correct.  1) Garvais had attested to his drug fund expenditures and there was no evidence of any motive for Garvais to provide false information or falsely document drug monies; 2) The informants being relied upon by Agent Little were knowledgeable of drug trafficking on the reservation; 3) Informant David Palmer admitted he was a recipient of drug monies but lacked precise recall of specific smaller payments; and 4) Informant Anne Numkena acknowledged contact with Garvais on the very days in which small-sum payments were documented.

While investigators are not limited to using informants with proven track records of providing reliable information, if one is going to rely upon information received through an informant, the statement must be reasonably corroborated by other matters within the officer's knowledge in order to establish probable cause.  A reasonable investigating officer would have concluded that further investigation was required before instituting proceedings based solely on these informant's unverified statements.  The content of the information provided by the informants and its degree of reliability was so lacking, that in this court's view it does not even give rise to any reasonable suspicion that Garvais was involved in a crime, let alone support a finding of probable cause.

Finally, specifically as to the counts of embezzlement and misappropriation of tribal funds, the court notes that a minimal requirement of criminal liability, is conduct.

ORDER - 30

The mere harboring of the intent to engage in criminal conduct does not constitute a crime. A crime is only committed if an "evil thinker becomes an evil doer." *Wharton's Criminal Law*, § 25 (2009). Despite the investigative report's conclusion to the contrary, there was no evidence in the investigative report or elsewhere of any overt act of use of funds for personal use. Garvais denied such use. As such, there was a lack of probable cause for counts 19 and 20.

### iii. Agent Little's Disclosure was not in Good Faith

Defendant argued at summary judgment and at trial that it had proven probable cause as a matter of law by clearly demonstrating "...that the defendant, before instituting criminal proceedings...made to the prosecuting attorney a full and fair disclosure, *in good faith*, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a charge..." *Bender v. City of Seattle*, 99 Wash.2d 582, 500, 664 P.2d 492 (1983)(emphasis added). This rule appears appropriate for one who is not motivated by an improper purpose and who reasonably and honestly believes certain facts establish the guilt of another. The court finds this is <u>not</u> the case here. Agent Little did not fully disclose the facts known to him (e.g. the Warning and Assurance forms, and the retaliatory origins of the complaint) and the disclosure does not qualify as "fair" or in "good faith" under the circumstances which are described more fully in the section below on malice. Moreover, liability here is based not only on the initiation but also the continuation of the prosecution after having reviewed the Shively letter. If an individual, after the initiation of criminal charges acquires the means of asserting the charge was not well founded or groundless, his or her failure to intervene and have the prosecution discontinued or to sever his or her connection with it subjects that person to malicious prosecution liability. As concluded in *Banks v. Nordstrom*, a full and honest disclosure of all material facts in initiating the proceeding is irrelevant to the contention that the defendant maliciously continued the prosecution. 57 Wash.App. 251, 260 (Wash. App. 1990).

ORDER - 31

d. *Conclusion as to Probable Cause*

Officers are routinely called upon to investigate allegations of criminal conduct, and then in the face of conflicting versions of events, make common-sense determinations of whether probable cause exists to believe *crimes* were committed.    In reckless disregard for the rights of Garvais, the BIA and Agent Little ignored this duty before pressing for the institution of criminal charges.  On March 6, 2003, the BIA stated to the tribal prosecutor that there was "sufficient evidence...uncovered to support the allegations."  In order to be "sufficient" for criminal prosecution, there must be probable cause.  In July 2003, the United States Attorney explained why the evidence was insufficient to charge Garvais criminally and why it would have been "inappropriate" to do so based on the information contained in the investigative report.  Even if blind to these deficiencies beforehand, Mr. Shively's letter certainly informed them.    Mr. Shively's letter was not just "a lot of assumptions and a lot of personal statements" as Agent Little testified.  An objective investigator would have realized the letter outlined the missing elements: evidence of intent and sufficiently reliable evidence of criminal conduct.  Nevertheless, Agent Little and the BIA, pressed forward urging and supporting the tribal prosecution and opposing the Plaintiff's petition for writ of habeas corpus.

Probable cause is lacking when the initiation of proceedings is motivated not by reasonably reliable information of criminal activity but purely by a desire to retaliate against a person.  The utter lack of evidence of a culpable state of mind for any one of the twenty-two charges and the lack of sufficiently reliable information evidencing criminal conduct,    contribute to this court's conclusion that the motivation for Garvais' prosecution was not "deterrence and reformation" but rather the alternative that *Morissette* spoke of -- retaliation and vengeance.

Plaintiff has proven by a preponderance of the evidence that the Defendant caused the institution and continuation of criminal proceedings without probable cause.

**4. "Malice": Improper Motive or Reckless Disregard**

ORDER - 32

The element of malice is satisfied by proving the prosecution was undertaken from improper or wrongful motives or in reckless disregard of the rights of the Plaintiff.

> Malice as a term of law has a broader significance than that which is applied to it in ordinary parlance. The word "malice" may simply denote ill will, spite, personal hatred, or vindictive motives according to the popular conception, but in its legal significance it includes something more. It takes on a more general meaning, so that the requirement that malice be shown as part of the plaintiff's case in an action for malicious prosecution may be satisfied by proving that the prosecution complained of was undertaken from *improper or wrongful motives* or in *reckless disregard* of the rights of the plaintiff. Impropriety of motive may be established in cases of this sort by proof that the defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to be guilty, or (2) primarily because of hostility or ill toward him, or (3) for the purpose of obtaining a private advantage as against him. Newell, Malicious Prosecution (1892), 237, § 3; 34 Am.Jur. 728, Malicious Prosecution, § 45; 38 C. J. 421-425, Malicious Prosecution §§ 60-67; 3 Restatement, Torts (1938), § 668.

*Peasley v. Puget Sound Tug & Barge Co.,* 13 Wash.2d 485, 502, 125 P.2d 681 (1942)(emphasis added*); see also*, *Bender v. City of Seattle*, 99 Wash.2d 582, 598 (1983).

In particular circumstances, malice may be inferred from a lack of probable cause. *Pallett v. Thompkins*, 10 Wash.2d 697, 699-700, 118 P.2d 190 (1941). This inference is appropriate particularly where probable cause has been totally lacking in a criminal proceeding brought against the malicious prosecution plaintiff or where an action was brought in total disregard of the accused's rights. The court finds that, *inter alia*, malice can be inferred from the lack of viable probable cause for the multiplicitous 22-count Criminal Complaint lodged against Garvais. However, Plaintiff need not rely upon this inference, given the other facts supporting the finding of malice outlined herein.

It is a rare to have a case with evidence of wrongful motive and recklessness which is as blatant and pervasive as the matter *sub judice*. The BIA's internal affairs investigation of Garvais originated from two sources: the Spokane Tribe and Garvais' District V commander from Billings, Montana, Edward Naranjo. The Tribe's retaliatory animus toward Garvais for his investigation of a tribal member and tribal descendant could not have been more obvious. The reservation's Chief of Police, Flett, had gone to the Tribal Council to get them to defend his officers, who had been placed on

ORDER - 33

administrative leave pending the BIA's internal affairs investigation. The Tribe wanted the internal investigation dropped and the officers reinstated. The Tribal Council met with the two patrol officers and summoned Naranjo from Billings. Garvais was not permitted to attend the meeting, despite his request. These meetings resulted in the brazen Tribal Resolution 2002-51 passed on November 21, 2001, requesting Garvais' removal and an internal affairs investigation of Garvais, *as well as his supervisors*. Tribal prosecutor Margo Hill testified that attorney Dave Lundgren from her office, who was not called as witness at trial, was at these Tribal Council meetings and "might have" drafted the Resolution. The same day as the passage of the Resolution, Lundgren questioned Garvais about his use of the money for narcotics investigations and requested an accounting of funds, which Garvais provided. (Ex. 518).

Disregarding the retaliatory motivation for the Resolution and knowing he was also a target of the Tribe's ire, Naranjo immediately went personally to Garvais' home and told him he was going to be detailed off the Spokane Reservation. In the days and months which followed, Naranjo apparently informed Garvais that internal affairs was going to be speaking with him about the alleged "misuse of money for narcotics investigations." (Ex. 518). Garvais prepared reports to document his drug fund expenditures. He testified at trial that at that point he believed this investigation might have been in regards to the tens of thousands of dollars with which Naranjo had purchased a car.

As stated, *supra*, on November 30, 2001, tribal chairman Alfred Peone sent a letter and the "prank" Resolution to the BIA's Director of the Office of Law Enforcement Services, Robert Ecoffey. It requested an investigation of Garvais and "and all those in his chain of command up to and including District V Commander Ed Naranjo" in regards to their conduct in the investigation of the patrol officers for theft. (Ex. 514).

Despite the evident motivation of the Tribe and perhaps Naranjo to target Garvais, the Internal Affairs Division opened an investigation of Garvais and assigned Little to

ORDER - 34

investigate on April 15, 2002. As Little testified, he was trained to conduct investigations according to the BIA handbook. That handbook provides one relevant reference point from which to evaluate the conduct of Agent Little in the investigation of Garvais. The BIA's Law Enforcement Handbook section on the Internal Affairs Division [IAD] states the division's purpose is as follows:

> "The purpose of the IAD is to ensure the integrity of OLES [Office of Law Enforcement Services] through an internal system whereby objectivity, fairness and justice are ensured by a impartial investigation and review of allegations of misconduct against OLES employees. This system provides citizens with a equitable and effective avenue for redress of their legitimate grievances against OLES employees. IAD readily accepts all complaints of misconduct and fairly and objectively investigates these complaints. OLES employees determined to be guilty of misconduct will be appropriately disciplined. IAD also provides OLES employees due process to identify unfounded and unsubstantiated allegations. IAD will be alert for the discovery of training deficiencies and the need for new policies or policy changes."

(Ex. 17 at 1). The handbook states that investigations are intended to "determine the truth" and "will be objective, fair, and thorough." (Ex. 17 at 6). To do this the investigator is required to "keep an open mind at all times and gather all the facts" and give the accused employee "ample opportunity to deny or justify an alleged action." (Ex. 17 at 7).

In sharp contrast to this written policy, the evidence undisputedly demonstrates that from its very inception, this internal affairs investigation had the purpose of the criminal prosecution of Garvais. The complaint that Little claimed to have been tasked to investigate, did not relate to Garvais' handling of the car stereo theft investigation, his treatment of his co-workers, or perhaps neglect of BIA policies or procedures. Rather, prior to investigation or any fact finding, this investigation's designated purpose was to investigate the *crimes* of forgery, false statements, embezzlement, fraud, and theft. Little offered no explanation for this purpose, but admitted having talked to Naranjo. Little documented that the complaint against Garvais had been reported by Naranjo, but failed to mention the obviously biased complaint of the Tribe. In fact, though admittedly aware of the Tribe's "prank" Resolution and letter to the BIA, his 248-page investigation

ORDER - 35

nowhere mentions it. Little testified that he did not investigate or concern himself at all with the potential motivation for the complaint because it made no difference to him. This conduct was in reckless disregard of Garvais' rights and was certainly not a process aimed to identify unfounded and unsubstantiated allegations, or to discover training deficiencies. Rather, as Little admitted, from its inception, he intended to submit this investigation to a prosecuting authority.

The reckless disregard of Garvais' rights continued during the investigation. The BIA handbook instructs an investigator, prior to an interview of the accused employee, to provide the a "confidential written notification of the complaint" which is to include a copy of the "original complaint or a summary adequately listing the relevant facts" and the employees rights and responsibilities during the investigation. (Ex. 17). At the beginning of the interview, BIA policy requires the investigator to provide a "Warning and Assurance" form which requests the employee's consent to answer questions voluntarily, and advises the employee of his rights and the subject matter of the interview. Such policies stem from established due process rights and the prohibition of the use of coerced statements in criminal prosecutions. *See Garrity v. New Jersey,* 385 U.S. 493, 497-98, 87 S.Ct. 616, 618-19, 17 L.Ed.2d 562 (1967).

The evidence shows that prior to his first interview, Garvais was never provided a copy of the complaint or informed of the relevant facts (Agent Little testified the origins of the complaint did not matter to him). At the interview on May 28, 2002, Garvais was never -in writing or verbally- informed of the violations of criminal law which were being investigated.   Deceptively, the Warning and Assurance form provided by the agents to Garvais indicated the interview concerned "confidential drug funds, drug evidence, case file".  (Ex. 509).  The agents did not inform Garvais that he was being criminally investigated. By contrast, the second time Agent Little requested an interview of Garvais months later, the form indicated the interview was about "providing false and deceptive information during an official interview, falsification of official documents, improper

ORDER - 36

drug investigative techniques, evidence mishandling." (Ex. 510). In addition, none of the warning forms were included in the investigative report.

The BIA's malicious investigation and prosecution is also evidenced by the fact that it pursued prosecution simultaneously with the United States and the Tribe.  Just three months after having submitted the investigation to the United States Attorney for review and while it was under review, the investigation was sent to the Tribe with a prosecution recommendation.  Tribal prosecutor Parlange testified that it was not unusual for the U.S. Attorney to take many months to review a case.  Agent Little testified he could not recall a single time an investigation of a federal officer was ever sent to a tribal prosecutor.  Notably, the March 6, 2003 BIA letter to the tribal prosecutor recommending prosecution makes no mention of the pending review by the U.S. Attorney's Office. Agent Little testified he could not recall why the investigation was referred to two prosecuting authorities, however, the evidence demonstrates the BIA was very anxious to have action taken against Garvais, and despite calls to the United States Attorneys' office, that office was not acting quickly enough for them.

Finally, as stated *supra*, there is direct evidence of actual ill-will and hostility on the part of Agent Little toward Garvais.  The unrebutted testimony is that he pointed his finger at and stated to Garvais' wife "I'm going to get Duane, whether I have to go tribal, state or federal–I will get him."

Plaintiff has proven by a preponderance of the evidence that his prosecution was initiated and relentlessly pursued by the Defendant for malicious motives and in reckless disregard of his rights.


**5. Damages**

Having established the essential elements of the malicious prosecution claim, Garvais is entitled to recover damages.  This degree of recklessness by an agency of the United States government, whose purpose must include integrity of law enforcement, is

ORDER - 37

unacceptable, although the court is not awarding punitive damages.  On the facts as developed by the internal affairs investigation, there was no good reason to believe that Plaintiff had acted criminally.  What the investigation revealed were training deficiencies, poor management, and the need to develop new policies.  These were conclusions that the investigation ignored because the aim was not to be objective, thorough and fair, but to prosecute Garvais.  The court believes Agent Little's conduct was influenced by individuals who were not witnesses at trial. Hopefully, the agency will seek an explanation so that its future internal affairs investigations do not improperly lead to irreparably damaged careers and lives. No one ought to be "charged with a crime, exposed to the danger of a conviction, and subjected to the expense, vexation, and ignominy of a public trial merely for the gratification of another's malice or ill will." *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash.2d 485, 496-97 (1942).

In determining a reasonable amount of damages in this case the court has considered the generally wide range of malicious prosecution awards.  *See e.g.*, *Taylor v. Saunders*, 93 Wash.App. 1059 (1999)(not reported)($30,000 jury award for claim against security guard who reported false information to police which lead to Plaintiff's prosecution and trial for attempted assault and attempted vehicle prowling); *Peterson v. Littlejohn*, 56 Wash.App.1 (1989)($115,000 jury award for claim against investigator whose negligent failure to properly investigate lead to unfounded charges of attempted rape); *Thrift v. Hubbard*, 974 S.W.2d 70 (Tex.App.-San Antonio 1998)($437,300 jury award for claim against business associate after charges of misapplication of funds, fraud, and theft were dismissed); *Bhatia v. Debek*, 287 Conn. 397, 948 A.2d 1009 (Conn. 2008)($2.5 million award for claim against former girlfriend after he was acquitted of sexual assault charges and second charge of risk of injury to child was dismissed); *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988)($800,000 award for claim against several members of the Chicago police force who conspired to frame an innocent George Jones for murder and rape).  Though Plaintiff requested an award in excess of $700,000,

ORDER - 38

the court believes the award in this case is just compensation for the harm sustained by Garvais.

Garvais is entitled to $413,102.66 in compensation for his wrongful arrest, imprisonment, injury to his reputation, mental anguish, and emotional distress. This compensation is also based upon the evidence which establishes that Plaintiff was arrested, without warning, by his former professional colleagues on August 9, 2003, while attending a public event on the Colville Reservation. He was handcuffed and placed in a patrol car in the presence of his now wife and young children, and incarcerated until his family members posted bond on August 13, 2003. He hired counsel to challenge the Tribal Court's criminal proceedings, and though the proceeding was stayed, he remained subject to the criminal prosecution for sixteen months until this court granted the habeas petition and ordered the criminal complaint dismissed. Ultimately, he lost his career and professional opportunity as a federal law enforcement officer. In addition to his legal expenses, the court has considered the fear, humiliation, embarrassment, mental anguish, harm to reputation and emotional distress the Plaintiff needlessly suffered as a result of the Defendant's actions.

The court has also weighed the number and nature of the charges pursued against Garvais, and how the toll of prosecution increases as the number of charges increase-- in this case 22 counts lacking probable cause. All the evidence before the court suggests Garvais had a very good reputation prior to the initiation of the BIA internal affairs investigation. He had served honorably in the United States Marine Corps. Garvais had received excellent reviews as a law enforcement officer, he possessed the respect of his colleagues, and his supervisor said he viewed him as a "damned good officer that had potential" (Ex. 519 at 35) in federal law enforcement. The serious charges of crimes of fraud, theft, forgery, perjury and embezzlement, wrongfully pursued against Garvais were matters which could not be more harmful to the career of someone in law enforcement whose professional integrity depends upon honest services. In calculating damages, the

ORDER - 39

court has considered the gross professional, personal, and social stigma attached to having allegations like these made against him.

### III. <u>CONCLUSIONS OF LAW/ORDER</u>

Pursuant to the foregoing Findings of Fact and Conclusions of Law and having fully adjudicated the parties claims in this matter and a decision having been duly rendered, the court hereby directs the Clerk of the Court to enter Final Judgment on a separate document for the Plaintiff Duane H. Garvais on his claim of malicious prosecution against the United States of America in the amount of $413,102.66 plus costs.

**IT IS SO ORDERED.**  The Clerk is hereby directed to enter this Order, enter Judgment and furnish copies to counsel.

Dated this 17th day of February, 2010.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 40